**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Lamonica T. Weglarz,

Plaintiff,

v.

Civil No. 00-2708 (RHK/JMM)
**MEMORANDUM OPINION AND ORDER**

RT Minneapolis Franchise, L.L.C.,

Defendant.

---

Donald Harold Nichols and Paul J. Lukas, Nichols, Kaster & Anderson, Minneapolis, Minnesota, for Plaintiff.

Eric John Nystrom, Lindquist & Vennum, P.L.L.P., Minneapolis, Minnesota, for Defendant.

---

RT Minneapolis Franchise, L.L.C. ("RT") is a franchisee of Ruby Tuesday, Inc, a national chain of restaurants. (Affidavit of Guerrino A. Ruta, Jr. ("Ruta Aff.") at ¶ 2.) RT owns and operates five Ruby Tuesday restaurants in the Minneapolis/St. Paul area, including one in Champlin. (Id.) Plaintiff Lamonica T. Weglarz was employed as a hostess and a server at the Champlin Ruby Tuesday from June 26 to October 6, 2000. (Deposition of Lamonica T. Weglarz ("Weglarz Depo.), pp. 44, 192-93.)

In this action, Weglarz alleges that she was subjected to sex, race and reprisal discrimination in violation of 42 U.S.C. § 1981, Title VII fo the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and the Minnesota Human Rights Act, Minn. Stat. §§ 363.01



FILED OCT 12 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD OCT 12 2001
DEPUTY CLERK

et seq. Specifically, Weglarz alleges that Jeff Gusciora, a manager at the Champlin restaurant, sexually harassed her on a number of occasions. She further alleges that several co-workers made racially derogatory comments to her and "keyed" her car because of her race. She additionally contends that she was terminated because of her race. Finally, Weglarz alleges that she was terminated in retaliation for reporting the above-mentioned discrimination.

Before the Court is RT's Motion for Summary Judgment. RT asserts that it is entitled to judgment on Weglarz's discrimination claims because (a) Weglarz cannot show that she was subject to "severe and pervasive" sexual or racial harassment, and (b) Weglarz cannot establish a causal connection between her complaints to management and her termination because she was terminated for non-discriminatory reasons. For the reasons set forth below, the Court grants Defendant's Motion.

## Background[1]

---

[1]For the purposes of Summary Judgment we view the facts in the light most favorable to the non-moving party, in this case the Plaintiff. Defendant argues that Plaintiff should be prohibited from augmenting the factual allegations she made in the answers to Defendant's first set of interrogatories under both Bank of Illinois v. Allied Signal Safety Restraint Systems, 75 F.3d 1162 (7th Cir. 1996), and Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361 (8th Cir. 1983). Neither case appears to be controlling here. In both cases the plaintiff was essentially recanting answers given in previous interrogatory answers or depositions. This is a far cry from augmenting the factual allegations that Weglarz made in her interrogatory answers. Weglarz has at no point changed her story but has merely added to it. Additionally, Weglarz's duty to supplement her interrogatories was excused when the information at issue was "revealed by a witness in a deposition or otherwise through formal discovery." Transclean Corp. v. Bridgewood Services, Inc., 77 F.Supp.2d 1045, 1061 (D.Minn. 1999).

Even if Allied and Camfield were to apply however, it would make no difference in this case. Viewing the facts as Plaintiff asks us to view them there is no material issue of fact for a

Weglarz began working as a host at the Champlin restaurant on June 26, 2000. On July 3, 2000 RT transferred Gusciora to the Champlin location as a manager. (Ruta Aff. at ¶ 5, Exh. A.) Some time after July 22, 2000 Weglarz reported to Lisa Rocca, the general manager for the Champlin restaurant, and Karen Hecimovich, a manager at the Champlin restaurant, that she was having problems with Gusciora. (Weglarz Depo. at 23.) Although the exact chronology of the events is unclear, the following events happened some time in July and early August.

On two occasions Gusciora rubbed Weglarz's shoulders as she was working at the host stand. (Id. at 15.) During both encounters Gusciora placed his hands on Weglarz's shoulders for about 30 seconds. (Id. at 26.) During the first encounter Gusciora asked Weglarz to clean his house. (Id. at 16-17.) Gusciora stated that he could pay her more than RT and would not require her to wear a uniform as she could work naked. (Id.)

Several days after this encounter while Weglarz was walking into the restaurant Gusciora greeted her by saying "yo, bitch, what's up?" (Id. at 23.) Weglarz, later in the day, asked Gusciora why he had spoken to her in that manner and Gusciora responded, "Isn't that what you and your homies call each other?" (Id. at 26.) After Weglarz told him that she did not speak to people in that manner Gusciora rubbed her shoulders and told her to get to work. (Id.) After these encounters Weglarz complained to Rocca who

---

jury to decide. Therefore the court will view the facts as the Plaintiff presents them in her memorandum and ignore that she failed to identify some of these incidents when answering Defendant's interrogatories.

said she would take care of the situation. (Id. at 42, 45, 89.)

On another occasion after Gusciora had been preparing the salad bar he told Weglarz that he only washed his hands before he went to the bathroom. (Id. at 30.) He further explained that he knew where his "dick" has been but did not know where his hands had been. (Id. at 29.) Gusciora repeated this joke to a number of other women in Weglarz's presence. (Id. 30.)

On at least one occasion Gusciora told Weglarz that she "should be [his] woman." (Id. at 87.) Weglarz told Gusciora that she was not interested in him and that she was married. (Id. at 40.) Gusciora ignored her response and said that her marriage did not bother him. (Id.)

Gusciora also made inappropriate comments to other women in front of Weglarz. (Id. at 30, 212.) Weglarz reported that Gusciora made a crude gesture to Elayne Remick while she was present and that he told his "hand washing joke" to several other women in her presence. (Id. at 30.)

Weglarz reported the majority of these incidents to Rocca and also reported at least one incident to Hecimovich. (Id. at 42, 45, 89.) Some time after making these reports Gusciora began swearing and yelling at Weglarz. (Id. at 222-23.) One specific incident Weglarz reported involved Gusciora yelling at her to "get the f--- out of the kitchen" while she was waiting for a to-go box after her shift had ended. (Id. at 217, 222.) In addition Gusciora ripped up Weglarz's seating charts and threw her punch card at her.

(Id. at 110.)

Some time in mid-August Rocca directed Aaron Pouncy, a manager at RT, to meet with Weglarz about the foregoing incidents. (Deposition of Lisa Rocca ("Rocca Depo.") at 26-27.) Rocca told Pouncy to simply take note of every problem that Weglarz was having with Gusciora and did not to direct him to resolve anything at that time. (Id. 27.) Either at that meeting or the night before Pouncy phoned Weglarz and asked her to write down everything that had occurred between her and Gusciora. (Weglarz Depo. at 80.) At the meeting Weglarz described the conduct detailed above. (Id. at 119-20.) After the meeting Pouncy relayed the information he had learned to Rocca. (Deposition of Aaron Pouncy ("Pouncy Depo.") at 11-12.) Several days later Weglarz approached Pouncy and told him that she was still uncomfortable around Gusciora. (Id.) Pouncy did not ask for any specific information at the time but relayed her feelings on to Rocca. (Id. at 18.)

On August 18, Rocca met personally with Weglarz. (Weglarz Depo. at 125.) Weglarz again described the conduct detailed above. (Id. at 125-26.) Rocca informed Weglarz that she would discuss the issue with Guerrino Ruta, Jr., the owner of RT. (Rocca Depo. at 29.) On August 19, after Rocca had informed Ruta of Weglarz's complaints, Ruta, Rocca, and Weglarz met at the Champlin restaurant. (Weglarz Depo. at 125.) Weglarz again detailed the facts described above. (Id. at 127.)

When Gusciora came to work on August 20, Ruta and Rocca met with him and informed him that he was being terminated. (Deposition of Guerrino A. Ruta, Jr. ("Ruta

Depo.") at 7.) Gusciora was informed that he was being terminated for "job performance and how he dealt with people." (Rocca Dep. at 32.) He was not informed of the allegations made by Weglarz and was not given an opportunity to respond to those allegations. (Id. at 32-33.) The letter documenting Gusciora's termination stated:

> Jeff's professional behavior is in question. He is perceived as being rude and offensive to team members and managers. He is accused of making remarks and gestures to team members that are unacceptable. Our standards do not permit this type of behavior. Jeff has also been late and most recently has been making unreasonable schedule demands.

(Affidavit of Tiffany A. Sanders, Exh. A.) After Gusciora's termination Weglarz did not complain of any other sexual harassment. (Weglarz Depo. at 93.)

Some time in late August Weglarz reported to Pouncy that her car had been keyed in the Ruby Tuesday's parking lot. (Id. at 157.) Weglarz alleged that Elayne Remick, a server at RT, had keyed her car. (Id. at 158.) Pouncy determined that there was nothing he could do about the situation and did not confront Remick with the allegation. (Pouncy Depo. at 28.)

In September, 2000 Weglarz was confronted with a number of racial slurs. Michelle, a server at RT, called Weglarz a "black bitch." (Weglarz Depo. at 101.) Weglarz reported this comment to Mike Pargamon, a manager at RT. (Id. at 151.) Pargamon responded by laughing and saying "Well, you must have really pissed her off." (Id.) Weglarz then reported the incident to Pouncy. (Id.)

Again in September, while Weglarz was training to become a server, a co-worker

told her that Champlin was an "uptight community" and that it would probably not be "alright" for a black person to serve food in the restaurant. (Id. at 162.) Weglarz approached Pouncy about this comment and asked if it were true that she would not be allowed to serve food at the restaurant. (Id. at 240.) Pouncy replied "No. I'm just working on it." (Id.)

On October 4, 2000 Weglarz was working as a server, and some tip money disappeared from a table. (Weglarz Depo. at 58.) Loreal Orr, a server at RT, said "no money was missing until that black girl started working here." (Id. at 56.) The next day Rocca called a meeting to discuss disruptions in the restaurant that involved Weglarz, Carol Vit, Orr, and Stephanie Beckfeld. (Id. at 70.) At the meeting Rocca and other managers informed the four servers that their bickering about money had to stop. (Rocca Depo. at 5.) Rocca told the four servers they should consider themselves to be role-models and, if they were unable to conform their conduct to higher standards, they would be terminated. (Id. at 14, 21, 24.) Following this large meeting, the managers met with each server individually to discuss the matter. (Weglarz Depo. at 75.) During the meeting with Weglarz, Rocca told her that she was disliked by a large percentage of her co-workers and needed to change her attitude or she would be terminated.[2] (Id.)

After the meeting, Beckfeld, one of the servers at the meeting, called Pouncy and

---

[2]As Weglarz left this individual meeting she allegedly told the other three servers to "watch themselves." (Pouncy Depo. at 54.) Weglarz denies making this accusation but the three other servers told Rocca that she had made the statement. (Weglarz Depo. at 171-72.)

stated that she had received a threatening phone call from Weglarz. (Pouncy Depo. at 34.) Beckfeld said that the caller did not identify herself but that the caller had said "her white ass should watch out." (Id.) Beckfeld told Pouncy that she knew the caller was Weglarz because the caller "sounded black." (Weglarz Depo. at 171.) Beckfeld also called Rocca and made the same allegations. (Id.) During the call to Rocca, Beckfeld resigned, citing the threat to herself and her family as the reason for her decision. (Rocca Depo. at 23.) Later that evening, Pouncy received a call from Weglarz in which she claimed to have received a call from Beckfeld accusing her of threatening Beckfeld's family. (Weglarz Dep. at 171.)

On October 8, 2000 Weglarz called the restaurant to obtain her work schedule. (Id. at 192-93.) During this call Rocca asked Weglarz to resign. (Id.) When Weglarz refused, Rocca terminated her. (Id. at 193.) Weglarz asked why she was being terminated and Rocca said that it was for poor work performance. (Id.)

## Analysis

### I. Standard of Decision

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In order for the moving party to prevail, it must demonstrate to the Court that "there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986). A factual dispute is material only when its resolution affects the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2509-10 (1986). A factual dispute is genuine if the evidence is such that it could cause a reasonable finder of fact to return a verdict for either party. See id. at 251-52, 106 S. Ct. at 2512.

In analyzing a motion for summary judgment, the district court must view all of the evidence and the inferences to be drawn therefrom in the light most favorable to the non-moving party. See id. at 250, 106 S. Ct. at 2511. The non-moving party may not, however, rest on the allegations or denials in the pleadings, but must set forth specific facts sufficient to raise a genuine issue of material fact for trial. See Celotex, 477 U.S. at 324, 106 S. Ct. at 2553. Moreover, if a party cannot support an essential element of its claim or defense, summary judgment must be granted as to that claim or defense, for a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. See id. at 322-23, 106 S. Ct. at 2552.

## II. Weglarz's Claim of Sexual Harassment

Under Title VII of the Civil Rights Act of 1964 "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religions, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[3] Plaintiff does not claim to have been subject to any tangible employment action on account of her sex, but instead asserts she was subjected to a hostile work environment. As such Plaintiff must demonstrate that: "(1) she is a member of a protected group; (2) unwelcome harassment occurred; (3) a causal nexus existed between the harassment and her protected-group status; and (4) the harassment affected a term, condition, or privilege of employment." Bradley v. Widnall, 232 F.3d 626, 631 (8th Cir. 2000). RT appears to concede the first three elements of this test, and contests only whether Gusciora's conduct affected a "term, condition, or privilege of employment." Id.

In order to affect a term or condition of the employment, the harassment must be "severe or pervasive." Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998). "Incidents of environmental sexual harassment 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Id. at 787 n.1 (quoting Carrero v. New York City Housing Auth., 890 F.2d 569, 577 (2nd Cir. 1989)). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Id. at 788 (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998)). In conducting this analysis, the Court is guided by a series of factors including "the

---

[3]Plaintiff also brings her sexual discrimination claim under the Minnesota Human Rights Act ("MHRA"). The Court applies the same analysis in reviewing claims brought under Title VII and the MHRA. Cronquist v. City of Minneapolis, 237 F.3d 920, 926 (8th Cir. 2001).

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510, U.S. 20, 23 (1993).

Plaintiff contends that this court should not attempt to determine whether the conduct in this case rises to the level of being "severe or pervasive" but instead should leave that issue for the jury. In making this argument Plaintiff cites Howard v. Burns Bros., Inc., 149 F.3d 835 (8th Cir. 1998). Howard, however, involved an appeal from an entry of judgment after a jury verdict and as such is controlling. Id. at 837. After a jury has deliberated the court should naturally give great deference to its conclusions.

Viewing the facts in the light most favorable to the Plaintiff, the Court concludes that a reasonable jury could find that the following events constitute unwelcome behavior based on sex:

- Gusciora rubbed Weglarz's shoulders.
- Gusciora asked Weglarz to clean his house in the nude.
- Gusciora greeted Weglarz by saying "Yo, bitch."
- Gusciora told a joke about washing his hands in Weglarz's presence.
- Gusciora told Weglarz she should be his woman.
- Gusciora yelled at Weglarz, ripped up her seating charts and threw a punch card at her.

For the purposes of this motion the court will assume that these incidents could constitute unwelcome behavior based on sex. None of these incidents was particularly severe. In no instance was Weglarz threatened nor is there any evidence that Weglarz was humiliated in front of any sizable group of people.

Additionally these incidents are not pervasive. Although these incidents were definitely boorish and unprofessional they do not establish a hostile working environment. All of the incidents involved one person, Gusciora, and were limited temporally to at most a six week period in July and August. In fact all of the cases that Plaintiff cites involve far more evidence of harassing conduct. Moring v. Arkansas Dept. of Corrections, 243 F.3d 452, 456-57 (8th Cir. 2001) (affirming the District Court's denial of judgment as a matter of law where the jury had found the following conduct to be sexual harassment: Mr. Smith engaged in conversation of a sexual nature on the drive to Calico Rock, he appeared barely clothed at the plaintiff's door, he sat on her bed, he touched her thigh and attempted to kiss her, he told her that she "owed" him for her job, he indicated he wanted to have an affair, and he refused to leave her hotel room when asked to leave); Hathaway v. Runyon, 132 F.3d 1214, 1217-18 (8th Cir. 1997) (reversing entry of judgment as a matter of law where a co-worker slapped and grabbed Plaintiff's buttocks, laughed at her, made growling noises at her, stared at her all over a period of eight months, and cornered her is a room for a significant period of time); Carter v. Chrysler Corp., 173 F.3d 693, 696-97 (8th Cir. 1999) (reversing summary judgment as to

sexual harassment claim where co-worker called Plaintiff a "bitch" almost every other day, and frequently cursed, whistled, gave her the finger, threw bolts and screws into her work area, sometimes hitting her, painted a red line to separate their work areas and told her not to cross it, made racial comments, poured motor oil on her chair and on the floor of her work area, brought Playboy magazines to work and read them during breaks at a table in her line of sight, stared at her in a hostile manner and repeatedly erected a cardboard barrier between their stations, put grease on her safety glasses, threw trash in her work area and placed unwelcome objects in her work station, including a dead roach and a photograph of a naked white man, and wrote graffiti in the men's restroom saying "Gloria sucks dick" and you could buy something from Gloria for a hundred dollars). In cases with similar conduct other courts have granted and affirmed summary judgment. See Hocevar v. Purdue Frederick Co., 223 F.3d 721, 738 (8th Cir. 2000) (affirming summary judgment where a supervisor called Plaintiff a "bitch," "made sexual advances towards Plaintiff and pulled her close to have full-body contract during a dance," told Plaintiff that he and another colleague had been discussing "what great legs" she had during a presentation, and suggested at a company gathering that he was going to have a sexual liaison with three female employees that evening); Scusa v. Nestle U.S.A. Co., Inc., 181 F.3d 958, 966-67 (8th Cir 1999) (affirming summary judgment where Plaintiff was patted on her bottom, had kisses blown at her, had fellow co-workers make sexual comments to her, had her car keyed in the employee parking lot, was yelled and cursed at

during meetings and at other times, and was given the silent treatment and threatened for filing a claim).

In total Plaintiff has failed to establish that the alleged harassment was "severe or pervasive." As such Plaintiff is unable to show that the "harassment affected a term, condition, or privilege of employment." Instead the Plaintiff has merely shown that she was subjected to a number of "offhand comments and isolated incidents."

## III. Weglarz's Claim for Racial Discrimination

"In order to establish a prima facie case of racial discrimination, the plaintiff must show that she 1) was a member of a protected group, 2) was meeting the legitimate expectations of her employer, 3) suffered an adverse employment action, and 4) that similarly situated employees, who are not members of the protected group were treated differently." Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000). If this burden is met the burden then shifts to the Defendant to show a legitimate, non-discriminatory reason for the adverse employment action. Id. Finally the burden shifts back to the Plaintiff to show that the articulated reason was merely pretext. Id.

Weglarz points to the following events to support her claim that she was terminated because of her race:[4]

---

[4]In her Memorandum in Opposition to Defendant's Motion plaintiff does not argue that her car being keyed is evidence of racial discrimination. Even if she were to make such an argument it would be unavailing. There is no evidence to indicate who damaged her car nor is there any evidence to indicate that race was a factor in the vandalism. Scusa, 181 F.3d at 969-70 (finding similar allegations insufficient where there was no indication of who had vandalized the

- She was called a "black bitch" by a co-worker.
- Loreal Orr, a server at RT, said "no money was missing until that black girl started working her."
- She was told by a co-worker that Champlin was an "uptight community" and that the community would not want her to serve food.

For the purposes of this motion the court will assume that these statements were made.

Initially, Weglarz fails to demonstrate that she was treated differently from other similarly situated employees. Weglarz attempts to compare herself to Orr, Vit, and Beckfeld, but this comparison is not compelling. While management warned all four servers about their behavior on October 5, 2000, that is where the similarities end. None of the other servers was subsequently accused of making threats to the other servers or of placing anonymous phone calls.

Even if Weglarz had made out a prima facie case, summary judgment would still be proper because RT has a legitimate, non-discriminatory reason for her termination. All four servers were put on notice at the October 5th meeting that their behavior was unacceptable and that if the situation did not improve that they would be terminated. After this warning Rocca was informed that Weglarz had told the other three servers to "watch themselves" and that Weglarz had called Beckfeld and threatened her family.

Although Weglarz denies that she made either of these threats there is no genuine

---

car).

issue of material fact that the general manager was told that the threats had occurred. The court is "not concerned with the correctness or wisdom of the reason given for [Rocca's] decision, but only 'whether [the reported incident] was the real reason for [Weglarz's] termination and not a pretext for [race] discrimination." Gill v. Reorganized Sch. Dist. R-6, 32 F.3d 376, 379 (8th Cir. 1994) (second and fourth alternations in original).

Weglarz is unable to attribute a single discriminatory act or comment to Rocca to lend any support to her allegation that her termination was race based. "Evidence demonstrating discriminatory animus in the decisional process needs to be distinguished from 'stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process.'" Clearwater v. Independant Sch. Dist. No. 166, 231 F.3d 1122, 1126 (8th Cir. 2000) (quoting Fast v. Southern Union Co, 149 F.3d 885, 890 (8th Cir. 1998)). The statements made by Weglarz's co-workers are insufficient for two separate reasons. First, they cannot be used to attribute race based animus to Rocca. Radabaugh v. Zip Feed Mills, 997 F.2d 444, 449 (8th Cir. 1993) ("plaintiff must present 'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision.' Ostrowksi v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 182 (2d Cri. 1992)"). Second, these statements, even if attributable to Rocca, amount to nothing more than stray remarks insufficient to establish

a claim of discrimination. Radabaugh, 997 F.2d at 449.

## IV. Weglarz's Claim for Reprisal

To establish a claim of retaliation under Title VII, the MHRA and 42 U.S.C. § 1981, Plaintiff must show "(1) she engaged in a statutorily protected activity, (2) an adverse employment action was taken against her, and (3) a causal connection between the two events" existed. Bassett v. City of Minneapolis, 211 F.3d 1097, 1104-05 (8th Cir. 2000). At this time the Defendant does not challenge either of the first two parts of this test, instead focusing on whether there was a casual connection between the two events.

To establish a casual connection between the protected activity and the adverse employment action, the Plaintiff must show that the employer had reason to know of the protected activity in order to establish a prima facia case. Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 715 (8th Cir. 2000). Plaintiff has failed to demonstrate that Rocca, the decisionmaker in this case, had any knowledge of Weglarz's complaints regarding the racial slurs made by her co-workers. The evidence presented by Weglarz establishes that she complained to Pouncy, not Rocca, about the problems she was having with co-workers.

Alternatively the Plaintiff contends that she was retalitated against for reporting Gusciora's sexual harassment. This claim has absolutely no factual support in the record. Her complaint over this conduct occurred some two months prior to her termination and in the meantime, she was promoted. Even if the time frame between these events were

smaller, a temporal proximity is not enough to establish a connection in this context. Id. at 716 ("Generally, however, more than a temporal connection between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists.").

## Conclusion

Based on all of the files, records and proceedings, **IT IS ORDERED THAT** Defendant RT Minneapolis Franchise, L.L.C.'s Motion for Summary Judgment is **GRANTED** and Plaintiff's Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: October 12, 2001

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES: OCT 1 2 2001

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*